**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

SEAN BERNARD RUNNINGEAGLE,
*Petitioner-Appellant*,

v.

CHARLES L. RYAN, Director,
Arizona Department of
Corrections,
*Respondent-Appellee*.

No. 07-99026

D.C. No.
CV-98-01903-PGR

OPINION

Appeal from the United States District Court
for the District of Arizona
Paul G. Rosenblatt, Senior District Judge, Presiding

Argued and Submitted February 10, 2016
Pasadena, California

Filed June 10, 2016

Before: Harry Pregerson, Kim McLane Wardlaw,
and Carlos T. Bea, Circuit Judges.

Opinion by Judge Wardlaw

## SUMMARY[*]

### Habeas Corpus / Death Penalty

The panel affirmed the district court's denial, on limited remand, of claims of ineffective assistance of counsel brought in a habeas corpus petition in a capital case.

The district court originally denied the ineffective assistance claims as procedurally barred.  On appeal, the panel affirmed the district court's denial of the habeas petition but stayed the court of appeals' mandate and ordered a limited remand to allow the district court to reconsider its prior rulings in light of *Martinez v. Ryan*, 132 S. Ct. 1309 (2012), which announced a new equitable rule allowing a petitioner to show cause for the procedural default of certain ineffective assistance claims.  On limited remand, the district court concluded that the petitioner did not show cause under *Martinez*, and thus did not excuse the procedural default.

To show cause under *Martinez*, a petitioner must demonstrate that the state system in which he initially brought his ineffective assistance claims required that they be raised in initial-review collateral proceedings, and did not permit the petitioner to raise them on direct appeal.  He must also show that the attorney who represented him in post-conviction review proceedings performed deficiently and thereby prejudiced his case under the standards of *Strickland v. Washington*.

---

[*] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

The panel held that the district court erred in concluding that *Martinez* was inapplicable because, at the time of the petitioner's direct appeal, Arizona allowed defendants to bring ineffective assistance claims on direct appeal. The panel concluded that in fact, during the relevant period, Arizona did require petitioners to bring ineffective assistance claims in initial-review collateral proceedings, not expressly, but by virtue of the operation of its procedural system. Nonetheless, the petitioner failed to show that his post-conviction review counsel performed deficiently and to his prejudice.

The panel affirmed the district court's judgment and order, and its continued denial of the habeas petition. The panel lifted the stay of the mandate and ordered that it would issue in the regular course.

---

**COUNSEL**

Jennifer Y. Garcia (argued), Assistant Federal Public Defender; Jon M. Sands, Federal Public Defender; Arizona Federal Public Defender's Office, Phoenix, Arizona, for Petitioner-Appellant.

Jon G. Anderson (argued), Assistant Attorney General, Capital Litigation Section; Lacey Stover Gard, Chief Counsel; Mark Brnovich, Attorney General; Arizona Attorney General's Office, Phoenix, Arizona, for Respondent-Appellee.

---

**OPINION**

WARDLAW, Circuit Judge:

In 1988, petitioner Sean Bernard Runningeagle was convicted of two counts of first degree murder in Arizona state court.  He was sentenced to death in 1989, and the Arizona Supreme Court affirmed his conviction, sentence, and the denial of his state petition for post-conviction relief. *State v. Runningeagle (Runningeagle I)*, 859 P.2d 169 (Ariz. 1993).  Runningeagle then petitioned for a federal writ of habeas corpus, which the district court denied.  In 2012, while Runningeagle's appeal of that decision was pending before us, the Supreme Court decided *Martinez v. Ryan*, 132 S. Ct. 1309 (2012).  *Martinez* announced a new equitable rule that allows a petitioner to show cause for the procedural default of certain ineffective assistance of counsel ("IAC") claims.  We affirmed the district court's denial of Runningeagle's petition, but also stayed the mandate and ordered a limited remand to allow the district court to reconsider its prior rulings that several of Runningeagle's IAC claims were procedurally defaulted in light of *Martinez*.  *Runningeagle v. Ryan (Runningeagle II)*, 686 F.3d 758 (9th Cir. 2012).  On remand, the district court concluded that Runningeagle did not show cause under *Martinez*, and thus did not excuse the procedural default of the IAC claims.  Runningeagle appeals.

To show cause under *Martinez*, a petitioner must demonstrate, *inter alia*, that the state system in which he initially brought his IAC claims required that they be raised in initial-review collateral proceedings, and did not permit the petitioner to raise them on direct appeal.  He must also show that the attorney who represented him in post-conviction review ("PCR") proceedings performed deficiently and

thereby prejudiced his case under the standards of *Strickland v. Washington*, 466 U.S. 668 (1984).

We hold that the district court erred in concluding that *Martinez* was inapplicable because, at the time of Runningeagle's direct appeal, Arizona allowed defendants to bring IAC claims on direct appeal. To the contrary: during the relevant period, Arizona actually did require petitioners to bring IAC claims in initial-review collateral proceedings, not expressly, but by virtue of the operation of its procedural system. *See Trevino v. Thaler*, 133 S. Ct. 1911, 1915 (2013). The proceedings in this very case demonstrate the operation of Arizona's requirement. However, Runningeagle fails to show that his PCR counsel performed deficiently and to his prejudice. His IAC claims therefore remain in procedural default, and do not serve as a basis for federal habeas relief. We affirm the district court's denial of the petition.

## I. Factual Background

We again[1] take the facts as recited by the Arizona Supreme Court in its 1993 opinion:

> In the early morning of December 6, 1987, Runningeagle, [his cousin Corey] Tilden, and their two friends Orva and Milford Antone, were driving around Phoenix. Runningeagle wanted parts for his car, so the foursome stopped at the Davis house, which had a car parked outside. Runningeagle, Tilden and Orva got out of the car, while Milford

---

[1] *Runningeagle II*, 686 F.3d at 763–64 (quoting *Runningeagle I*, 859 P.2d at 171–72); *see also id.* at 763 n.1.

remained passed out drunk in the back seat. Runningeagle used his large hunting knife to remove two carburetors from the Davis car. Orva put them and an air scoop in the trunk of Runningeagle's car. Tilden and Runningeagle also stole a floor jack and tool box. Orva took a bicycle from the open garage.

Herbert and Jacqueline Williams, an elderly couple, lived next door to the Davises. Mr. Williams came out of his house and told the young men to leave or he would call the police. Orva returned to the car, but Runningeagle and Tilden approached Mr. Williams. Runningeagle concealed his knife by his side. Tilden carried a large, black flashlight. Runningeagle then began to tease and scare Mr. Williams with the knife. Mr. Williams retreated and told Runningeagle to put the knife away. Mrs. Williams then came out of the house and yelled at them. Tilden confronted Mrs. Williams, argued with her, and then hit her on the side of the head with the flashlight. Mr. Williams told them to leave his wife alone, and helped her back into the house. Runningeagle broke through the Williams' door with a tire iron, and he and Tilden barged in.

The noise awakened a neighbor, who heard Mrs. Williams crying and the words "bring him in" spoken by a tall, young man he saw standing in the Williams carport. The neighbor called "911," but by the time the

police arrived, Mr. and Mrs. Williams were dead. Mr. Williams suffered several head injuries and five stab wounds, three of which were fatal. Mrs. Williams also suffered several head injuries, one of which fractured her skull and was possibly fatal, in addition to four stab wounds, three of which were fatal.

The police searched the Williams home. The drawer in which Mrs. Williams stored her jewelry was open and some jewelry was missing. They found an empty purse, blood drops and two bloody shoe print patterns. They discovered Runningeagle's palm print on the clothes dryer next to the bodies.

Runningeagle discussed the crimes on several occasions before his arrest. He told his girlfriend that he had been in a fight with two people and had hit them "full-force." He showed her his car trunk full of the stolen property. He showed the hood scoop and carburetors to another friend. Tilden, too, spoke about the crimes and informed Runningeagle that an account of the burglary was on the radio and that "they got there an hour after we left."

When the defendants were arrested, the police found, among other things, the Davis air scoop with Runningeagle's prints on it, two carburetors, the tool box, Mrs. Williams' wallet and college pin, a large black flashlight with Tilden's prints on it, and the Davis

bicycle with Runningeagle's prints on the wheel rim. A Phoenix Police Department criminalist matched Runningeagle's shoes with the bloody shoe prints found at the Williams house, and also found that an inked print of Tilden's shoes made a pattern similar to other shoe prints at the house.

Runningeagle, Tilden, and Orva Antone were indicted on two counts of first degree murder, and one count each of first degree burglary of a residence, second degree burglary of a residence, third degree burglary of a car, theft of property valued between $500 and $1000, and theft of property valued between $250 and $500. Orva Antone pleaded guilty to burglary and testified for the state at the joint trial.

After a five-week trial, Runningeagle and Tilden were convicted on July 27, 1988. Runningeagle was found guilty of two counts of first degree murder, two counts of theft, and one count each of first degree burglary, second degree burglary, and third degree burglary. Tilden was convicted of the same charges except for third degree burglary.

*Runningeagle I*, 859 P.2d at 171–72.

## II.  Procedural Background

*A.  Sentencing and Special Verdict*

Baltazar Iniguez was appointed to represent Runningeagle at trial and sentencing.  Iniguez gathered a total of 15 letters from Runningeagle's family members and acquaintances, which he submitted as mitigation evidence.  Iniguez also presented the direct testimony of several witnesses on Runningeagle's behalf at evidentiary hearings, and he examined or cross-examined several of Tilden's witnesses, who were Runningeagle's family members or acquaintances, at these hearings.[2]

Arizona probation officers prepared two presentence reports ("PSRs") concerning Runningeagle, which contained information about his family and social background, criminal history, health, and use of alcohol and illicit substances. These reports quoted Iniguez, who vouched for Runningeagle's good character, stated that the murders were fueled by alcohol, and recommended leniency.  It does not appear from the record that Iniguez gathered outside information for the probation officers or disputed the accuracy of the PSRs.

Iniguez successfully petitioned the court under Arizona Rule of Criminal Procedure 26.5 for two mental health

---

[2] At the first of these hearings, Runningeagle sought the appointment of new counsel, and stated that Iniguez was "ineffective and inefficient." Iniguez moved to withdraw, citing the "barrier" between himself and his client, and Runningeagle's lack of cooperation.  The court denied these requests, and stated that Runningeagle would "have an opportunity to raise all of these allegations by way of Petition for Post-Conviction Relief."

examinations of Runningeagle. These examinations were conducted by Doctors M.B. Bayless and Francis A. Enos. Dr. Bayless diagnosed Runningeagle with antisocial personality disorder, and Dr. Enos found that his behavioral pattern was "sociopathic rather than neurotic or psychotic." Because Iniguez had requested these examinations under Rule 26.5—against the advice of Tilden's attorney, Roland J. Steinle III, who had recommended requesting court funds for private examinations[3]—Iniguez's attempts to exclude Dr. Bayless's and Dr. Enos's reports were unsuccessful, and he was required to file them with the court.

Before the final sentencing hearing, Iniguez submitted an eight-page sentencing memorandum. Iniguez argued that Runningeagle should be spared the death penalty, and should instead receive two concurrent life sentences. Iniguez contended that Runningeagle's mind was impaired by alcoholic "jungle juice" at the time of the murders; there was insufficient evidence that Runningeagle, rather than Tilden, committed the murders; and the murders were out of character. Iniguez also sought to rebut the anticipated aggravating factors relied upon by the state. He argued the killings were not "cruel, heinous and depraved," there was no evidence of an expectation of pecuniary gain, and they should not be considered two separate killings because both occurred

---

[3] Arizona Rule of Criminal Procedure 26.5 provided, "At any time before sentence is pronounced, the court may order the defendant to undergo mental health examination or diagnostic evaluation. Reports under this section shall be due at the same time as the pre-sentence report unless the court orders otherwise." According to Steinle, Arizona courts construed this rule to generally require disclosure of reports for use at sentencing. Thus, if a Rule 26.5 report contained negative information, there was no way to prevent the sentencing judge from considering that information.

within a "very short period of time," that is, that each murder was committed during the commission of the other. Finally, Iniguez claimed three mitigating factors were present: Runningeagle was young, intoxicated, and "under unusual or substantial duress." Iniguez did not present new evidence in support of the memorandum, and relied instead on the PSRs and trial testimony and evidence.

Runningeagle and Tilden were jointly sentenced at a February 3, 1989 hearing. The court issued a special verdict, from which it read at the hearing, sentencing Runningeagle to death and Tilden to two consecutive terms of life imprisonment. In imposing Runningeagle's sentence, the court found that the state had proved three statutory aggravating circumstances: that the murders were committed with the expectation of pecuniary gain; that they were "especially cruel, heinous and depraved"; and that Runningeagle was convicted of one or more homicides during the commission of the offense. *See* Ariz. Rev. Stat. § 13-703(F)(5), (6), (8) (1988). Upon considering the evidence submitted by Iniguez, the court found that the only mitigating circumstance for the murder counts was Runningeagle's age, "one day short of 19," which was not sufficient to call for leniency.[4] The court found that the testimony and letters from Runningeagle's family and friends did not compel mitigation. The court stated that Runningeagle had not shown any feeling for family or friends, that he was concerned only with "himself and his own appetites," and that the psychological reports indicated that he did not "have the types of feelings or emotions that people usually have for family or friends."

---

[4] The court found that Runningeagle's burglary and theft counts, but not the murder counts, were mitigated by a "[h]istory of family problems although not overly severe."

Although the court quoted at length from the Bayless and Enos reports at the sentencing hearing, and also considered a psychological report prepared by Doctor Roger M. Martig for prior Juvenile Court proceedings, the court stated that it did not consider these as aggravating circumstances, but neither did it find that they weighed in favor of mitigation.

In sparing Tilden death, the court found "significant and considerable differences" between him and Runningeagle. The court found that the state had not proved beyond a reasonable doubt that Tilden participated in the murders with the expectation of pecuniary gain, though the other two aggravating factors were present. The court noted that Tilden had a difficult childhood, but it did not expressly give weight to this circumstance. It found that psychological evidence that Tilden suffered from a personality disorder was not, in itself, a mitigating circumstance. The court found highly significant the great weight of the evidence suggesting that Runningeagle, and not Tilden, had personally inflicted the fatal stab wounds. The court concluded that Tilden had followed his charismatic, older, more intelligent cousin on the night of the murders, and that Tilden, unlike Runningeagle, had a conscience and was capable of rehabilitation. The court stated, however, that "these comparisons were not used in aggravation of defendant Runningeagle's sentence."

## B. PCR and Appellate Proceedings

Following sentencing, Runningeagle commenced PCR proceedings pro se by filing a form petition for post-conviction relief and a petition for writ of coram nobis. The coram nobis petition alleged that Iniguez had failed to perform an adequate investigation, mount an effective defense, or object to inadmissible evidence and prosecutorial

misconduct. On March 23, 1990, John M. Antieau was appointed to represent Runningeagle in the PCR and appellate proceedings.[5] The Arizona Supreme Court stayed Runningeagle's direct appeal pending determination of his PCR petition. The same judge who had presided over trial and sentencing also presided over the initial PCR proceedings.

Over the government's objection, the PCR court granted Antieau's motion for the appointment of an investigator, Mary Durand, and a mental health expert, Doctor Otto Bendheim. Antieau filed a supplemental petition challenging Runningeagle's sentence on eleven grounds, including two IAC claims for failure to move to sever Runningeagle's trial from Tilden's, and for a deficient closing argument. Antieau also filed a second supplemental petition in which he challenged Dr. Bayless's and Dr. Enos's diagnoses of antisocial personality disorder, and requested $1500 in additional funds so a new doctor, Bendheim, could interview Runningeagle in prison.

On April 23, 1991, the PCR court summarily dismissed Runningeagle's petitions. It found that, in his initial pro se petition, Runningeagle had not raised a "'colorable claim' . . . of ineffective assistance of trial counsel," and that even if his complaints were valid, the evidence against him was overwhelming, and the result would not have been different. The court found that the claims raised in the supplemental petitions filed by Antieau were "still raisable on direct appeal." It denied the request for additional funding for Dr. Bendheim to prepare a report, which the court viewed as "not

---

[5] Antieau was appointed after Runningeagle successfully sought the removal of another appointed PCR and appellate counsel.

appropriate in the context of post-conviction relief proceedings." In addressing this issue, the court opined that Runningeagle appeared to "take[]one aspect of the Court's sentencing as if it were the only basis for the Court's determination of the appropriate and lawful sentence." The court denied a motion for rehearing filed by Antieau.

Antieau petitioned the Arizona Supreme Court for review of the PCR court's denial of relief. This petition was consolidated with Runningeagle's direct appeal, which was also filed by Antieau. On April 20, 1993, the Arizona Supreme Court affirmed Runningeagle's conviction and sentence and the denial of his PCR petition. It reasoned that, "[b]ecause Runningeagle failed to show that counsel's conduct was deficient, the trial court properly dismissed his petition for post-conviction relief."

## C. *Subsequent Proceedings*

After the United States Supreme Court denied certiorari and the Arizona Supreme Court issued its mandate, Runningeagle initiated pro se a second PCR proceeding, which was ultimately dismissed because he failed to timely file a petition. Runningeagle next filed a federal habeas petition, which was dismissed without prejudice to allow him to exhaust additional claims in state court.

Runningeagle then initiated a third PCR proceeding in the Arizona Superior Court: this was the state proceeding in which the claims raised on this appeal were found procedurally defaulted. In a 224-page petition filed by a new attorney, Runningeagle claimed, *inter alia*, that Iniguez had performed deficiently by failing to (i) investigate and present key mitigation evidence; (ii) obtain a competent and

independent mental status examination; (iii) develop and advance a theory that Tilden actually committed the homicides; and (iv) request the appointment of a second attorney. On October 21, 1996, the Superior Court dismissed Runningeagle's claims and the petition. It held that, even if the mitigation-evidence claims were "colorable," they were procedurally defaulted under Arizona Rule of Criminal Procedure 32.2(a)(3), and the inculpation and second-counsel claims were in default and, alternatively, not colorable.[6] The Arizona Supreme Court denied Runningeagle's petition for review of these rulings.

On April 15, 1999, Runningeagle filed the amended federal habeas petition now before us. He raised, among others, claims that Iniguez was ineffective because he failed to retain, use, and competently prepare independent mental health experts, or investigate and present mitigating evidence at sentencing ("mitigation-evidence IAC claim"), inculpate Tilden ("inculpation IAC claim"), and request a second counsel ("second-counsel IAC claim"). On February 6, 2004

---

[6] Runningeagle also claimed that Antieau was constitutionally ineffective on appeal and in PCR proceedings. The Arizona Superior Court found this claim precluded, and alternatively dismissed it on the merits. We reject, however, the government's suggestion that this alternative merits ruling is entitled to AEDPA deference. Runningeagle does not on this appeal seek to relitigate a "claim" regarding PCR counsel's performance on which basis his habeas petition could be "granted" (nor could he under current Supreme Court precedent). *See* 28 U.S.C. § 2254(d); *Harrington v. Richter*, 562 U.S. 86, 98 (2011). Rather, he seeks to show cause for the procedural default of underlying trial-level IAC claims on the basis of PCR counsel's allegedly deficient performance. The Superior Court's ruling cannot possibly be construed to address this issue, as the equitable rule of *Martinez* had not yet been announced in 1996.

and March 10, 2006, the district court issued interim orders finding each of these claims procedurally defaulted.

The district court denied Runningeagle's remaining claims on the merits, and we granted his request for a certificate of appealability as to several of these claims. The Supreme Court decided *Martinez* on March 20, 2012. On July 18, 2012, we filed our opinion affirming the district court's rulings on the merits of the claims presented on appeal. Also on July 18, 2012, we granted Runningeagle's motion for remand to the district court "for the limited purpose of reconsidering its procedural default holdings on Runningeagle's ineffective assistance of counsel claims . . . in light of *Martinez v. Ryan*."[7] On limited remand, the district court expanded the record and denied Runningeagle's request for a further evidentiary hearing. On October 2, 2014, the district court entered an order holding that Runningeagle had not shown cause under *Martinez* for the procedural default of the mitigation-evidence, inculpation, and second-counsel IAC claims, leaving them in default.

## III.  Standard of Review

We review de novo the district court's dismissal of a habeas petition and its procedural default determinations. *Sexton v. Cozner*, 679 F.3d 1150, 1153 (9th Cir. 2012). Runningeagle filed his amended federal petition after the

---

[7] By granting this motion, we rejected the government's argument that Runningeagle had abandoned any request for relief based on ineffective assistance of PCR counsel. We similarly reject the government's suggestion that we reconsider this ruling. *Cf. Ball v. Rodgers*, 492 F.3d 1094, 1102 (9th Cir. 2007) (discussing the "exception to the waiver rule . . . for intervening changes in the law") (ellipsis in original) (citation omitted); 9th Cir. R. 27-10(a)(3).

effective date of the Antiterrorism and Effective Dealth Penalty Act of 1996 (AEDPA). *Runningeagle II*, 686 F.3d at 766. Therefore, any claim that was adjudicated on the merits in state court is reviewed under the "highly deferential standards" of AEDPA. *Davis v. Ayala*, 135 S. Ct. 2187, 2198 (2015); *see* 28 U.S.C. § 2254(d). Any federally reviewable claim that was not adjudicated on the merits in state court is reviewed de novo. *See Cone v. Bell*, 556 U.S. 449, 472 (2009).

## IV.  Discussion

### A.  The Legal Framework of Martinez.

Federal courts generally cannot grant habeas relief for a claim defaulted in state court "pursuant to an independent and adequate state procedural rule . . . unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).[8] The constitutionally ineffective performance of counsel, which is "imputed to the State," may provide cause, but there is no general constitutional right to an attorney in PCR proceedings. *Id.* at 752–54. The Supreme Court in *Coleman* left unanswered the question of whether and under what circumstances there may be a constitutional right to counsel where "state collateral review is the first place a prisoner can present a challenge to his conviction." *Id.* at 755.

---

[8] Procedural default may also be excused where "failure to consider the claim[] will result in a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750. Runningeagle does not argue that this exception applies.

Without answering that question, the *Martinez* Court held that cause may be established for a prisoner's procedural default of a claim of ineffective assistance at trial by "[i]nadequate assistance of counsel at initial-review collateral proceedings," i.e., "collateral proceedings which provide the first occasion to raise a claim of ineffective assistance of at trial." 132 S. Ct. at 1315. *Martinez* stated that this "narrow exception" to *Coleman* was an "equitable" one, necessary because:

> When an attorney errs in initial-review collateral proceedings, it is likely that no state court at any level will hear the prisoner's claim. . . . And if counsel's errors in an initial-review collateral proceeding do not establish cause to excuse the procedural default in a federal habeas proceeding, no court will review the prisoner's claims.

> . . . .

> Without the help of an adequate attorney, a prisoner will have . . . difficulties vindicating a substantial ineffective-assistance-of-trial-counsel claim. Claims of ineffective assistance at trial often require investigative work and an understanding of trial strategy. When the issue cannot be raised on direct review, moreover, a prisoner asserting an ineffective-assistance-of-trial-counsel claim in an initial-review collateral proceeding cannot rely on a court opinion or the prior work of an attorney addressing that claim. To present a claim of ineffective assistance at trial in

accordance with the State's procedures, then,
a prisoner likely needs an effective attorney.

*Id.* at 1315–18 (citations omitted). In *Trevino v. Thaler*,
133 S. Ct. 1911 (2013), the Supreme Court summarized the
four-part test announced in *Martinez*:

> *Coleman* [contains] an exception, allowing a
> federal habeas court to find "cause," thereby
> excusing a defendant's procedural default,
> where (1) the claim of "ineffective assistance
> of trial counsel" was a "substantial" claim;
> (2) the "cause" consisted of there being "no
> counsel" or only "ineffective" counsel during
> the state collateral review proceeding; (3) the
> state collateral review proceeding was the
> "initial" review proceeding in respect to
> the "ineffective-assistance-of-trial-counsel
> claim"; and (4) state law *requires* that an
> "ineffective assistance of trial counsel [claim]
> . . . be raised in an initial-review collateral
> proceeding."

*Id.* at 1918 (second and third alterations in original) (citing
*Martinez*, 132 S. Ct. at 1318–19, 1320–21).

The government does not dispute that the third *Martinez*
requirement is satisfied: Runningeagle seeks to show cause
based on Antieau's supposedly deficient representation
during his initial PCR proceeding. We address the remaining
requirements in turn.

*B.  Arizona Law Required Prisoners to Raise IAC Claims in
    Initial-Review Collateral Proceedings During the
    Relevant Time Period.*

We consider at the outset what Arizona law required to
assert an IAC claim at the time Runningeagle brought his
appeal and first petition for post-conviction relief.  This is an
appropriate place to begin, because however deficient or
prejudicial the performance of trial or PCR counsel, cause
may be shown under *Martinez* only if, "under state law,
claims of ineffective assistance of trial counsel must be raised
in an initial-review collateral proceeding."  132 S. Ct. at
1320.  The Supreme Court explained in *Trevino* that this
requirement could be satisfied where state law did not
explicitly require petitioners to assert IAC claims in initial-
review collateral proceedings, but "[t]he structure and design
of the [state] system in actual operation . . . make it virtually
impossible for an ineffective assistance claim to be presented
on direct review."  133 S. Ct. at 1915 (citation omitted).

The district court held that, at the time Runningeagle
brought his appeal and first petition for post-conviction relief,
Arizona law provided for direct appellate review of IAC
claims.  The district court found that Runningeagle, through
Antieau, in fact raised IAC claims in the PCR proceeding,
"and then consolidated those claims with the other issues
raised on appeal."  It concluded that this consolidation
procedure was the functional equivalent of "providing direct
appellate review of ineffectiveness claims."  Accordingly, the
district court held that the procedural default of
Runningeagle's claims could not be excused under *Martinez*.

Arizona did not expressly require IAC claims to be raised
in collateral proceedings until 2002, when the Arizona

Supreme Court decided *State v. Spreitz*, 39 P.3d 525 (Ariz. 2002).**[9]** Runningeagle filed his supplemental PCR petition and appeal in 1990 and 1991, respectively, before *Spreitz* became law. However, at this time, the "structure and design" of Arizona law as set forth by the Arizona Supreme Court made the meaningful presentation of an IAC claim on direct review "virtually impossible." *See Trevino*, 133 S. Ct. at 1915 (citation omitted).

In *State v. Valdez*, 770 P.2d 313 (Ariz. 1989), the Arizona Supreme Court strongly urged defendants to raise IAC claims in petitions brought under Arizona Rule of Criminal Procedure 32, which governs PCR proceedings. *Id.* at 319. The Court stated that it was "reluctant" to decide IAC claims without the benefit of an evidentiary record that could not be developed in direct appellate proceedings. *Id.* at 318. The Court set forth its recommended procedure: "[a]s a general matter," a defendant who seeks to raise an IAC claim during the pendency of his direct appeal "should file the proper petition under Rule 32 . . . in the trial court and seek an order from the appellate court suspending the appeal." *Id.* at 319. The trial court could then make an evidentiary record and issue its ruling, and after that, the defendant could move for consolidation of the post-conviction proceedings and the direct appeal.**[10]** *Id.* The Arizona court system followed the

---

**[9]** *Martinez*, which was also brought by a petitioner in the custody of the State of Arizona, cited *Spreitz* for the proposition that "Arizona law . . . did not permit [Martinez's appellate counsel] to argue on direct appeal that trial counsel was ineffective." *Martinez*, 132 S. Ct. at 1314.

**[10]** In *Krone v. Hotham*, 890 P.2d 1149 (Ariz. 1995), which was decided after Runningeagle filed his first PCR petition and appeal, the Arizona Supreme Court retreated from the *Valdez* procedure of staying appeals pending the resolution of Rule 32 proceedings. *Krone* stated that this

*Valdez* procedure when it decided Runningeagle's claims: Antieau raised IAC claims in a Rule 32 proceeding, and the Arizona Supreme Court stayed his direct appeal pending that proceeding, and then consolidated them for appellate review.

In *State v. Carver*, 771 P.2d 1382 (Ariz. 1989), which was decided shortly after *Valdez*, the Arizona Supreme Court held: "We will not reverse a conviction on ineffective assistance of counsel grounds on direct appeal absent a separate evidentiary hearing concerning counsel's actions or inactions. Only where we may clearly determine from the record that the ineffective assistance claim is meritless will we elect to consider the issue on direct appeal." *Id.* at 1390.[11]

*Valdez* and *Carver* rendered it all but futile for an Arizona criminal defendant to raise an IAC claim on direct appeal.[12] At best, he would be required to raise it again by Rule 32 petition. At worst, the claim would be deemed clearly meritless and denied without any further development of the record. As in *Trevino*, there is no principled reason why

procedure had "proved unworkable and resulted in long delays," and thereafter would be followed only in "the most exceptional circumstances." *Id.* at 1151–52.

[11] *Carver*'s holding was reiterated in *State v. Atwood*, 832 P.2d 593, 616 (Ariz. 1992), which was decided after Runningeagle brought his appeal and first petition for post-conviction relief, and before the Arizona Supreme Court affirmed Runningeagle's conviction and sentence and the denial of his PCR petition.

[12] We express no opinion as to whether, before *Valdez* and *Carver* were decided, Arizona law effectively required petitioners to bring IAC claims in initial-review collateral proceedings. *Cf. Lambright v. Stewart*, 241 F.3d 1201, 1203 (9th Cir. 2001) (stating that, as of 1984, no Arizona case required IAC claims to be brought on direct appeal).

federal law should "deny defendants the benefit of *Martinez* solely because of the existence of a theoretically available procedure, namely direct appellate review," which is "difficult, and in the typical case all but impossible, to use successfully, and which [Arizona] courts so strongly discourage defendants from using." 133 S. Ct. at 1920.

The district court found that *Trevino* did not apply because the *Valdez* procedure of staying the direct appeal and consolidating it with the Rule 32 proceeding in effect provided "direct appellate review of ineffectiveness claims." However, this consolidation was merely ministerial. Under *Valdez*, direct appeals and Rule 32 petitions remained on separate tracks, though they ultimately converged at the same station. Crucially, that convergence would occur after PCR counsel had raised the issues for review and developed the evidentiary record before the PCR court. The Arizona appellate court would concurrently review the direct appeal and the denial of the PCR petition, as it did in this case, but this is not the same as reviewing the petition in the first instance. *See Runningeagle I*, 859 P.2d at 171. *Martinez* makes clear that an appeal from an initial-review collateral proceeding is distinct from the initial-review collateral proceeding itself; the equitable excuse applies only to the latter. 132 S. Ct. at 1320.

Consolidation did not alter the result that, by "structure and design," the Arizona system in actual operation made it "'virtually impossible' for an ineffective assistance claim to be presented on direct review." *Trevino*, 133 S. Ct. at 1915 (citation omitted). The Arizona system therefore posed the grave risk with which *Martinez* is concerned: that PCR counsel would fail to raise or develop substantial trial-level IAC claims, and, because PCR counsel's performance is not

constitutionally reviewable, any deficiency in this regard would result in "no court . . . review[ing] the prisoner's claims." *Martinez*, 132 S. Ct. at 1316. The equitable rules of *Martinez* and *Trevino* prevent this inequitable result.

Thus, during the period Runningeagle was litigating his direct appeal and Rule 32 petition, Arizona law in effect required the assertion of IAC claims in the initial-review collateral proceeding. The district court erred in holding otherwise.

## C. *Runningeagle Fails to Demonstrate the Prejudicial Default of a Substantial IAC Claim in PCR Proceedings.*

Where, as here, the state criminal justice system satisfies the characteristics required by *Martinez*, the petitioner must make two related showings about the strength of his particular IAC claim to excuse its default.

First, the IAC claim must be "a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit." *Martinez*, 132 S. Ct. at 1318. Thus, there must be a substantial showing of a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *See Strickland v. Washington*, 466 U.S. 668, 694 (1984). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* "When a defendant challenges a death sentence such as the one at issue in this case, the question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Id.* at 695.

Second, a petitioner must show that "appointed counsel in the initial-review collateral proceeding, where the claim should have been raised, was ineffective under the standards of *Strickland v. Washington*." *Martinez*, 132 S. Ct. at 1318. Construing *Martinez*, we have held that, to fulfill this requirement, a petitioner must show not only that PCR counsel performed deficiently, but also that this prejudiced the petitioner, i.e., that "there was a reasonable probability that, absent the deficient performance, the result of the post-conviction proceedings would have been different." *Pizzuto v. Ramirez*, 783 F.3d 1171, 1178 (9th Cir. 2015) (quoting *Clabourne v. Ryan*, 745 F.3d 362, 367 (9th Cir.), *proceedings suspended and mandate stayed* (Apr. 2, 2014), *and overruled on other grounds by McKinney v. Ryan*, 813 F.3d 798, 818 (9th Cir. 2015) (en banc)). Although the prejudice at issue is that in PCR proceedings, this is a recursive standard. It requires the reviewing court to assess trial counsel's as well as PCR counsel's performance. This is because, for us to find a reasonable probability that PCR counsel prejudiced a petitioner by failing to raise a trial-level IAC claim, we must also find a reasonable probability that the trial-level IAC claim would have succeeded had it been raised.[13]

---

[13] Runningeagle criticizes the *Clabourne* and *Pizzuto* framework for assessing prejudice, which he contends is inconsistent with *Martinez* and our en banc opinion in *Dickens v. Ryan*, 740 F.3d 1302 (9th Cir. 2014). He argues that this framework is "impossible-to-meet," in that it requires a petitioner to "prove the merits of his ineffective assistance claim before any evidentiary development of the defaulted, undecided claim just to clear the cause-and-prejudice hurdle to excuse the claim's procedural default." *See Detrich v. Ryan*, 740 F.3d 1237, 1245–46 (9th Cir. 2013) (en banc) (plurality opinion) (stating that a prisoner "need not show actual prejudice resulting from his PCR counsel's deficient performance, over and above his required showing that the trial-counsel IAC claim [is] 'substantial' under the first *Martinez* requirement").

None of Runningeagle's procedurally defaulted IAC claims satisfies both the substantiality and deficient performance criteria. Therefore, the procedural default of these claims is unexcused.

### 1.  The Mitigation-Evidence IAC Claim

We assume, for discussion purposes only, that the mitigation-evidence IAC claim, Runningeagle's strongest claim, is a "substantial" one, and therefore that there is "some merit" to the contention that Iniguez performed deficiently and to Runningeagle's prejudice at sentencing.[14]

---

We decline to revisit the *Clabourne*/*Pizzuto* standard. Assuming "substantial" claims and deficient performance of PCR counsel, Runningeagle could not ultimately obtain relief even under his preferred standard. Once default was excused, he would still need to prevail on the merits of the claim itself, which he is unable to do on any of his three claims. Runningeagle has had the opportunity to fully develop in the district court the evidentiary basis for his procedurally defaulted IAC claims. Under these circumstances, there is no meaningful difference between finding a claim in default and reviving it but denying it on its merits. There was no reasonable probability that PCR proceedings would have reached a different result if PCR counsel had raised the defaulted claim. Thus, were we to find cause for default under the *Detrich* plurality's proposed standard, we would still deny the revived claim on its merits, because there was no reasonable probability that trial and sentencing proceedings would have had a different result if trial counsel had performed effectively.

[14] *Martinez* suggests, via a "Cf." citation to *Miller-El v. Cockrell*, 537 U.S. 322 (2003), that the substantiality standard is comparable to the standard for a certificate of appealability to issue under 28 U.S.C. § 2253(c)(2). *Martinez*, 132 S. Ct. at 1318–19. Under this permissive standard, a petitioner need show only that "jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El*, 537 U.S. at 327.

### a. Antieau's Performance Was Not Deficient.

Under *Martinez*'s recursive framework, the next step is to evaluate PCR counsel's performance and its effect. Runningeagle contends that PCR counsel, Antieau, was ineffective for failing to investigate the failure to investigate by his predecessor, trial counsel Iniguez.

There is little record evidence, one way or the other, bearing on whether Antieau's performance in PCR proceedings was reasonable "under prevailing professional norms." *Strickland*, 466 U.S. at 688. First, Durand, the investigator appointed to assist Antieau in the PCR proceedings, declared in 2013 that Antieau was "overwhelmed by the case," was "not always prepared," and "did not perform adequately or appropriately"; that Durand "suspected that he had poly-substance abuse issues, including a problem with alcohol"; and that she did not recall "doing any investigative work on either the trial or sentencing portions of Runningeagle's case." This equivocal declaration, signed more than 20 years after the fact, does not establish ineffective performance. Durand declared that she did not remember performing investigative work, not that she did not perform it. One of Antieau's contemporaneous filings in the PCR proceedings, which stated that Durand had "not yet completed her work," undercuts her recollection.

Second, Runningeagle faults Antieau for failing to provide Dr. Bendheim, the mental health expert appointed in PCR proceedings, with materials outside the trial record. But it is not necessarily ineffective to tailor one's investigations to limitations of time and money, *see id.* at 681, and, given Dr. Bendheim's preliminary impression that the appropriate diagnosis for Runningeagle could have been the same as that

of his co-defendant, who received a life sentence, Runningeagle does not show that Antieau's pursuit of this lead and forbearance of others was a prejudicial strategic choice at the time.

Third, Runningeagle suggests that, had Antieau framed his request for additional funding for Dr. Bendheim differently, he likely would have received it. This is both speculative, and smacks of the judgment in hindsight forbidden by *Strickland*, *id.* at 680. Moreover, Runningeagle's prognostication of what likely would have occurred is contradicted by the PCR court's statement that "Petitioner . . . has taken one aspect of the Court's sentencing as if it were the only basis for the Court's determination of the appropriate and lawful sentence."

Finally, Runningeagle observes that the bulk of the claims Antieau raised in his supplemental PCR petition were dismissed for being raisable on direct appeal. This, too, smacks of hindsight, and does not speak to whether capable PCR counsel would have expected this outcome or whether it was typical of Arizona PCR proceedings at the relevant time.

Given the "highly deferential" standard under which we evaluate Antieau's performance, and the paucity of evidence that Antieau performed deficiently—which Runningeagle had a full opportunity to develop in district court following our limited remand—Runningeagle fails to overcome the "strong presumption that counsel's conduct falls within the wide

range of reasonable professional assistance."[15]   *Id.* at 689
(citation omitted). Runningeagle therefore cannot show cause
to excuse the default of the mitigation-evidence IAC claim
under *Martinez*.  *See Martinez*, 132 S. Ct. at 1318.

> b. *Antieau's Failure to Raise the Mitigation-Evidence IAC Claim in PCR Proceedings Was Not Prejudicial.*

Even if we were to conclude that Antieau's alleged failure
to investigate and present the mitigation-evidence IAC claim
in PCR proceedings was deficient, this claim would
nevertheless fail for lack of a showing of prejudice.
Similarly, to pretermit a lengthy and ultimately fruitless
discussion of what Iniguez did and did not do during his
representation of Runningeagle, others' observations and
recollections of Iniguez, and appropriate sentencing strategies

---

[15] It is not necessary here to delineate precisely what PCR counsel's
duties are, and how they are similar to or different from those of trial or
appellate counsel. *Martinez* contemplates that effective PCR counsel may
investigate "evidence outside the trial record" to determine whether a trial-
level IAC claim may be raised, 132 S. Ct. at 1318, but *Martinez* is silent
as to the scope of the duty to investigate in PCR proceedings. The
effectiveness of PCR counsel is evaluated "under the standards of
*Strickland*," *id*., but before *Martinez* there was no occasion to apply
*Strickland*'s constitutional standard in the PCR setting, where there is no
established constitutional right to counsel. *Strickland* is crystal-clear,
however, that effective performance is measured not by reference to any
"set of detailed rules," but rather by assessing "the reasonableness of
counsel's challenged conduct on the facts of the particular case, viewed
as of the time of counsel's conduct." 466 U.S. at 688–90. Even if we
accept Runningeagle's contention that PCR counsel has a broad duty to
investigate and preserve potentially meritorious trial-level IAC claims,
Runningeagle simply does not carry his burden to show that Antieau
"made errors so serious that [he] was not functioning as . . . 'counsel.'"
*Id.* at 687.

and sources of standards of care, we assume *arguendo* that Iniguez's investigation and presentation of mitigation evidence was deficient for purposes of *Strickland*. *See Strickland*, 466 U.S. at 697 ("The object of an ineffectiveness claim is not to grade counsel's performance. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed.").

Runningeagle contends that Iniguez prejudiced his defense during the penalty phase by failing to investigate or present key mitigation evidence. Runningeagle identifies several areas of his life that he argues Iniguez left unexplored: his difficult early childhood; his social and educational history; his medical background; his use of alcohol; the effect of his Native American heritage on his behavior and demeanor; and mental health evidence that he claims invalidates the diagnosis of antisocial personality disorder and may support a diagnosis of Post-Traumatic Stress Disorder ("PTSD"). Runningeagle also faults Iniguez for mishandling the request of expert reports under Rule 26.5, and failing to provide Doctors Bayless and Enos and the probation officers with the evidence Iniguez allegedly would have uncovered had he adequately investigated these areas.

> i. Much of Runningeagle's Newly Offered Evidence Is Cumulative.

Iniguez examined or cross-examined a number of Runningeagle's family members and acquaintances at evidentiary hearings, and solicited 15 letters on his behalf. This testimony and evidence detailed Runningeagle's childhood circumstances, including his mother's alcoholism, his social and educational history, and his medical problems as a child. The PSRs also described Runningeagle's troubled

family background, criminal history, peripatetic education and social circumstances, and history of childhood illness and injury.[16] The sentencing court considered these materials when it decided which sentence to impose.

The pertinent new evidence that Runningeagle offers includes the declarations of family members, classmates, ex-girlfriends, and the parents of one ex-girlfriend; and medical, educational, and juvenile records. This evidence does not materially expand upon what was already before the sentencing court. For instance, it is troubling to learn that, as a child, Runningeagle lived in a squalid house, surrounded by adults with substance abuse problems, who offered little nurturing; that he frequently observed violence among family members; and that he was sometimes so hungry, he would eat Vitamin C tablets. But this information does not alter the sentencing profile that was before the court. This included the letters, live testimony, and PSR that described "a great deal of dysfunction in the family," a house with "very little furniture and household provisions," in which there was frequently "no food," and circumstances that led Runningeagle's probation officer to be "tempted on more

---

[16] Runningeagle contends the PSRs were "largely erroneous and incomplete." He takes particular issue with the statement in the earlier of the two reports that "[w]ith the exception of drinking problems on the part of both his mother and stepfather, the defendant experienced no significant difficulties during his youth." However, the second PSR contradicted the first, and provided several examples of Runningeagle's childhood struggles. The second PSR stated that Runningeagle himself denied having "any dysfunction in his family," and that the new and troubling information, which was "contrary to the defendant's statement," came from his juvenile probation officer. *Cf. Strickland*, 466 U.S. at 691 ("[W]hat investigation decisions are reasonable depends critically on" "information supplied by the defendant.").

than one occasion to contact Child Protective Services." Additional details about Runningeagle's childhood sicknesses and injuries, or the vouchings of more remote acquaintances, likewise would not have affected the balance of mitigating against aggravating circumstances. *See Strickland*, 466 U.S. at 695; *see also Bobby v. Van Hook*, 558 U.S. 4, 11–12 (2009).

Runningeagle also argues that Iniguez did not properly investigate or present mitigation evidence regarding his use of alcohol. However, the court was aware that Runningeagle was intoxicated at the time of the murders. The presentence reports and Dr. Enos's report each made reference to Runningeagle's problems with alcohol. Further, Iniguez's sentencing memorandum argued that Runningeagle's alcohol use was a basis for leniency, and referred to trial evidence that, on the night of the murders, Runningeagle had been "drinking a powerful intoxicating liquor called Jungle Juice which is supposedly a mixture of Everclear and fruit juices. There is also evidence that defendant was drinking beer as well." Once again, the new evidence Runningeagle offers as to this issue is cumulative, and does not create a reasonable probability that the sentencer would have differently balanced aggravating and mitigating circumstances. *Strickland*, 466 U.S. at 695.

> ii. The New Mental Health and Cultural
> Evidence Is Equivocal.

The only new evidence offered by Runningeagle that does not merely elaborate upon what was already in the record concerns his mental health and the effect of his Native American cultural background on his manner of expressing himself. This evidence consists of (1) a 13-paragraph

declaration of psychologist Katherine DiFrancesca, dated August 20, 1996; (2) a 44-page report prepared by forensic psychologist Charles Harris Heller, dated July 17, 2006; and (3) a two-page, unsworn letter from psychiatric consultant Pablo Stewart to Runningeagle's habeas counsel, dated January 22, 2013. As the district court correctly concluded, this evidence is "equivocal" at best, and is insufficient to demonstrate *Strickland* prejudice.

Dr. DiFrancesca's affidavit was based on two personal meetings with Runningeagle, the Enos, Bayless, and Martig reports, juvenile and medical records, and social history information. Dr. DiFrancesca opined that Runningeagle was an alcoholic, suffered from "psychological and mental disorders resulting from his alcoholism," and had a conscience, and that the diagnosis of antisocial personality disorder was likely incorrect. She further opined that Runningeagle did not show his emotions publicly, including at his court proceedings, because he was raised within Native American culture, but that he felt "genuine remorse and shame" for the killings. Dr. DiFrancesca gave no affirmative diagnosis.

Dr. Heller's report was based upon a forensic examination of Runningeagle, his review of a variety of records, and his expertise in Native American mental health and culture, which he developed while providing mental health services to the Cherokee Nation of Oklahoma. Dr. Heller opined that Runningeagle had "severe alcoholism," as well as "indicators of post-traumatic stress which are unique to his childhood as a Native American child in Phoenix and . . . multiple traumatic experiences." Dr. Heller suggested that Dr. Bayless and Dr. Enos had wrongly diagnosed Runningeagle with antisocial personality disorder, because clinicians most

familiar with Caucasian patients tend to misdiagnose Native Americans and fail to perceive symptoms of stress and anxiety. However, Dr. Heller found that Runningeagle "does not meet full criteria for PTSD," although he criticized these "classical" criteria as they applied within the chronically stressful environment encountered by many Native Americans. Dr. Heller opined that "the likely reason why [Runningeagle] fails to meet full diagnostic criteria for PTSD is because he tends to minimize his symptoms in order to adhere to his false sense of self." Dr. Heller diagnosed Runningeagle with "an anxiety disorder not otherwise specified with PTSD features."

Dr. Stewart wrote that he interviewed Runningeagle for five hours, and had reviewed "a variety of social history documents including trial court proceedings, witness declarations, medical-mental health-school records, custodial records and the psychological evaluation of Dr. Heller dated July 17, 2006." He opined "to a reasonable degree of medical certainty[] that Mr. Runningeagle currently suffers from Posttraumatic Stress Disorder and that he suffered from this condition at the time of the offenses for which he has been sentenced to death." Dr. Stewart also speculated that Runningeagle may have suffered from Autistic Spectrum Disorder, Major Depressive Disorder, and Substance-Related Disorder at the time of the killings, but that further evaluation was needed as to these conditions.[17]

Runningeagle argues that, had Iniguez provided capable mental health professionals with complete records, along with

---

[17] Although Stewart's letter referred to an imminent diagnostic visit with Runningeagle scheduled for February 4, 2013, as of October 2, 2014, the district court had not received any evidence of further tests.

supporting expert analysis of his Native American cultural expression, the experts would have produced reports that looked more like the newly submitted materials than the Enos and Bayless reports, which Runningeagle contends should never have been presented to the sentencing court. These arguments are not persuasive.

First, the sentencing court stated expressly that, although it did not treat the Bayless and Enos reports as sufficient mitigating evidence, it also did not "use[] the information or the conclusions in these reports as aggravating circumstances." Thus, had Iniguez successfully excluded these reports, Runningeagle's balance of mitigating and aggravating circumstances would have remained the same, according to the sentencing judge.

Second, while the court remarked at the sentencing hearing and in its special verdict that Runningeagle had not shown empathy for the victims, and displayed little emotion for his family and friends, this was not the basis for its sentence. On the day of the sentencing hearing, the court observed that Runningeagle had "expressed some feelings towards his family or friends," but this did not change its conclusions. The court focused not on Runningeagle's apparent lack of affect, but on the thrill he apparently derived from committing the crimes, including the murders. Doctors DiFrancesca and Heller explained why people raised within a Native American culture might suppress negative emotions, downplay family conflict, or poke fun at themselves, but there was no evidence that the laughter, joy, and boasting following the murders was a shared form of cultural expression in response to heinous acts rather than an

expression personal to Runningeagle.[18] Thus, it is speculative to suggest that expert testimony about Native American culture would have altered Runningeagle's sentence.

Finally, even if there was some set of steps Iniguez should have taken that would have led his mental health experts to produce reports more like Doctors DiFrancesca's, Heller's, and Stewart's—a speculative and hindsight-plagued assumption—these reports are not of material mitigating weight. Dr. DiFrancesca gave no affirmative diagnosis. Dr. Heller used qualifying language, and concluded that Runningeagle did not meet the full diagnostic criteria for PTSD. Dr. Stewart, who projected the greatest certainty in his diagnosis, produced it more than 20 years after the crimes were committed, and provided no supporting analysis. Our precedent asks us to examine whether "the difference between the evidence that could have been presented and that which actually was presented is sufficient to 'undermine confidence in the outcome' of the proceeding." *Duncan v. Ornoski*, 528 F.3d 1222, 1240 (9th Cir. 2008) (quoting *Strickland*, 466 U.S. at 694). Runningeagle fails to demonstrate *Strickland* prejudice under this standard. *See Leavitt v. Arave*, 646 F.3d 605, 614 (9th Cir. 2011) ("Such [diagnostic] opinions, which couch results in tentative language, are simply not enough to show prejudice."); *Rhoades v. Henry*, 638 F.3d 1027, 1050 (9th Cir. 2011) ("Speculation about potential brain dysfunctions or disorders 'is not sufficient to establish prejudice.'") (citation omitted); *cf. id.* ("The mitigating value of [Dr. Pablo] Stewart's most

---

[18] The sentencing court noted that Tilden, whom Runningeagle concedes came from an "almost identical background[]," did not display the same positive "degree of relishing" as Runningeagle, and showed remorse and emotion.

concrete assessment, that Rhoades 'does suffer' from Post-traumatic Stress Disorder (PTSD), is lessened because his diagnosis admittedly does not satisfy the requirements of DSM–IV for this condition.").

There is no "reasonable probability" that, had Iniguez presented the new evidence, separately or collectively, "the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695. Therefore, even assuming deficient performance by Antieau and Iniguez, Runningeagle cannot show cause for the default of the mitigation-evidence IAC claim. *Martinez*, 132 S. Ct. at 1318; *Pizzuto*, 783 F.3d at 1178.

### 2.   The Inculpation IAC Claim

At trial, "Runningeagle's defense rested on the theory that the state failed to meet its burden of proof." *Runningeagle II*, 686 F.3d at 777. Runningeagle contends that this strategy was objectively unreasonable, and Iniguez should have argued at trial and sentencing that Tilden was the one who killed the Williamses, and that he was the "leader" of the group on the night of the murders. Runningeagle fails to show that this was a substantial IAC claim, much less that Antieau performed deficiently or prejudicially by failing to raise it in PCR proceedings.

No record or extra-record evidence supports the theory that Tilden personally killed either victim. Although it is true that the government's case against Runningeagle relied primarily on circumstantial evidence, the evidence that Runningeagle—not Tilden—stabbed the Williamses to death

was overwhelming.[19]   Runningeagle's theory that Tilden could have been the killer is based on Orva Antone's testimony that he witnessed Tilden striking Mrs. Williams in the head with a flashlight, and the testimony of a medical expert, Dr. George Bolduc, on cross-examination that these "blunt force injuries of the head could have been of a fatal nature." However, Dr. Bolduc consistently testified that Mrs. Williams's death was caused by a perforated heart, liver, and aorta, due to stab wounds through the chest and abdomen. In context, Dr. Bolduc's description of the blunt force injuries as potentially "fatal" meant that they could have caused death but for the intervening stab wounds, not that the head trauma could have been the actual cause of death.

---

[19] As we summarized this evidence previously:

> [T]he police found Runningeagle's palm print on the clothes dryer next to the victims' bodies and matched Runningeagle's shoes with the bloody shoe prints found at the house. Runningeagle discussed the crimes several times before his arrest and told his girlfriend—who testified at trial, and to whom he showed his car trunk full of the property stolen from the Williamses—that "he had been in a fight with two people and had hit them 'full-force.'" When the police arrested Runningeagle, they found the Williamses' stolen property. The evidence is even stronger in light of Antone's testimony that Runningeagle taunted and threatened the Williamses with his knife, waved the knife at them as they retreated, and then broke through the Williamses' door with a tire iron after the Williamses tried to get away.

*Runningeagle II*, 686 F.3d at 770 (citations omitted); *see also Runningeagle I*, 859 P.2d at 174 ("The trial court . . . found Runningeagle in fact killed the victims, and we agree.").

Runningeagle suggests that Iniguez could have swayed the judge or jury by uncovering and presenting evidence of Tilden's "violent past." However, this evidence would have been inadmissible at trial under Arizona Rule of Evidence 404(a), which prohibits the introduction of propensity evidence to prove that an individual acted "in conformity therewith on a particular occasion."[20] Even if this evidence could have been presented at sentencing, there is no showing that it could have possibly led Runningeagle, to whom the evidence overwhelmingly pointed as the killer, to receive a reduced sentence. As we previously concluded, "the trial court's detailed Special Verdict makes clear that the likely result of further inculpation of Tilden was a death sentence for Tilden and not a life sentence for Runningeagle." *Runningeagle II*, 686 F.3d at 771–72.

Because Runningeagle fails to show that the inculpation IAC claim was a "substantial" one of "some merit," the procedural default of this claim is not excused under *Martinez*. 132 S. Ct. at 1318.

### 3. The Second-Counsel IAC Claim

Runningeagle argues that Iniguez provided constitutionally deficient representation by failing to request the appointment of second counsel. Once again, Runningeagle does not show that this is a substantial IAC claim for purposes of *Martinez*.

---

[20] Arizona Rule of Evidence 404 was amended effective November 1, 1988, after trial and before sentencing. The quoted language appears in the codification in effect at each time.

Runningeagle relies on the 1989 ABA Guidelines, which stated that "[i]n cases where the death penalty is sought, two qualified attorneys should be assigned to represent the defendant." However, the Supreme Court has stressed that, while ABA Guidelines may be "evidence of what reasonably diligent attorneys would do," they do not define counsel's federal constitutional duty to "make objectively reasonable choices." *Van Hook*, 558 U.S. at 8–9 (citation omitted). Further, the Supreme Court has cautioned against the inference of per se rules of reasonableness from professional standards "so detailed that they would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions." *Id.* at 8 n.1 (citation omitted). The 1989 Guidelines are not, standing alone, enough to raise a substantial IAC claim. Rather, "[t]rial counsel cannot be said to be constitutionally ineffective [solely] for deciding not to bring in co-counsel," and, to raise a substantial claim, Runningeagle must present evidence of "some reason . . . why the first lawyer is unable to provide adequate representation." *Allen v. Woodford*, 395 F.3d 979, 998 (9th Cir. 2005) (alterations in original) (citation omitted).

Runningeagle observes that Tilden's counsel, Steinle, an experienced capital defense lawyer, obtained second counsel to assist him. Runningeagle also presents a September 27, 1988 letter from local counsel to Iniguez offering to assist with the sentencing hearing. This letter states that Iniguez had not returned counsel's earlier call. Finally, Newman, the investigator who interviewed Iniguez in 1994, declared that Iniguez stated that he felt "overwhelmed" by Runningeagle's case.

Runningeagle makes no freestanding showing of prejudice caused by any deficient performance, and so he cannot show that Iniguez performed deficiently by failing to request the appointment of second counsel.[21] Because Runningeagle's second-counsel IAC claim is insubstantial, he fails to show cause to excuse its default under *Martinez*.

## D. *The District Court Did Not Abuse Its Discretion by Denying Runningeagle's Request for an Evidentiary Hearing.*

The district court granted Runningeagle's motion to expand the record with a number of the exhibits described above. However, it denied Runningeagle's request for an evidentiary hearing at which he sought to present live testimony from Tilden's counsel, Drs. Stewart and Heller, trial defense investigator Gloria Castillo, mitigation fact witnesses, and experts in mitigation and capital defense. On this appeal, Runningeagle contends that, if *Martinez* cause is not shown outright, he is entitled to further factual development in district court.

---

[21] Although we have assumed that Runningeagle's mitigation-evidence IAC claim is "substantial," there is no demonstrated nexus between Iniguez's performance during the penalty phase and his lack of co-counsel. Even if such a nexus existed, Runningeagle would be unable to show cause for the default of the second-counsel IAC claim. As we have discussed, Antieau's failure to raise the mitigation-evidence IAC claim in PCR proceedings was not prejudicial. Likewise, Runningeagle cannot show that Antieau's failure to raise the second-counsel IAC claim was prejudicial, where the supposed prejudice caused by the underlying allegedly deficient performance—failure to investigate and properly present mitigation evidence—is identical. We reject Runningeagle's cumulative error argument, which would require us to accumulate a number of trial-level IAC claims that we have found insubstantial or unsuccessful on the merits in this and our prior opinion.

We review for an abuse of discretion a district court's determination that a petitioner is not entitled to an evidentiary hearing.**[22]** *Hurles v. Ryan*, 752 F.3d 768, 777 (9th Cir.), *cert. denied*, 135 S. Ct. 710 (2014). Where documentary evidence provides a sufficient basis to decide a petition, the court is within its discretion to deny a full hearing. *Phillips v. Ornoski*, 673 F.3d 1168, 1179 (9th Cir. 2012). "In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007).

We conclude that the district court did not abuse its discretion in denying an evidentiary hearing. "[O]ral testimony and cross-examination were not necessary because the documentary evidence submitted fully presented the relevant facts." *Williams v. Woodford*, 384 F.3d 567, 591 (9th Cir. 2004). The expanded record included the declarations of witnesses who would testify at a live hearing, and Runningeagle made no showing that their testimony would differ materially from their declarations. The credibility of these witnesses was not at issue, and could not have rendered their testimony sufficient to show cause under *Martinez*.

---

**[22]** Because Runningeagle sought to present evidence to support a showing of *Martinez* cause rather than to support directly a claim raised in state court, we do not review his request for an evidentiary hearing under the demanding standard of 28 U.S.C. § 2254(e)(2). *See Dickens*, 740 F.3d at 1321.

## V. Conclusion

Runningeagle has not shown cause for the procedural default of his IAC claims, nor has he shown that further district court proceedings are warranted. We therefore affirm the district court's judgment and order, and its continued denial of Runningeagle's habeas petition. As the *Martinez* claims are hereby resolved, we lift the stay of the mandate imposed by our July 18, 2012 order. It may issue in the regular course.

**AFFIRMED.**