**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

STEVEN LIVADITIS,
        *Petitioner-Appellant*,

v.

RON DAVIS, Warden,
        *Respondent-Appellee.*

No. 14-99011

D.C. No.
2:96-cv-02833-
SVW

OPINION

Appeal from the United States District Court
for the Central District of California
Stephen V. Wilson, District Judge, Presiding

Argued and Submitted May 9, 2019
San Francisco, California

Filed August 9, 2019

Before: Ronald M. Gould, Richard R. Clifton,
and Carlos T. Bea, Circuit Judges.

Opinion by Judge Clifton

# SUMMARY[*]

## Habeas Corpus / Death Penalty

The panel affirmed the district court's denial of Steven Livaditis's habeas corpus petition challenging his capital sentence.

Applying *Cullen v. Pinholster*, 563 U.S. 170 (2011), the panel considered only the record before the California Supreme Court (including the trial court record), and did not consider the evidence presented in the federal court evidentiary hearing. Because the California Supreme Court summarily denied Livaditis's state habeas petition, the panel considered whether there is any reasonable argument that could have supported that decision under the deferential AEDPA standard that applies in this context.

The panel held that the California Supreme Court did not unreasonably apply federal law or unreasonably determine facts in denying Livaditis's ineffective assistance of counsel claim based on counsel's failure to investigate and present in mitigation evidence of the mental impairments and abusive conduct of Livaditis's mother. The panel rejected Livaditis's argument that his counsel's performance was constitutionally deficient for failing to discover and present this evidence, and concluded that the state court could reasonably have concluded that Livaditis was not prejudiced by counsel's failure to do so.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel held that the California Supreme Court could have reasonably determined that Livaditis was not prejudiced by counsel's failure to investigate and present in mitigation evidence that Livaditis suffered from mental impairments prior to and through the time of his crimes. As it was unnecessary, the panel did not address counsel's performance with regard to this evidence.

## COUNSEL

Gary D. Sowards (argued), McBreen & Senior, Los Angeles, California; Jan B. Norman, Altadena, California; for Petitioner-Appellant.

Seth P. McCutcheon (argued), Deputy Attorney General; Victoria B. Wilson and James William Bilderback II, Supervising Deputy Attorneys General; Lance E. Winters, Senior Assistant Attorney General; Gerald A. Engler, Chief Assistant Attorney General; Xavier Becerra, Attorney General; Office of the Attorney General, Los Angeles, California; for Respondent-Appellee.

## OPINION

CLIFTON, Circuit Judge:

California state prisoner Steven Livaditis appeals the district court's denial of his habeas corpus petition challenging his capital sentence. Livaditis pled guilty to three counts of first degree murder, five counts of robbery, three counts of kidnapping, and one count of second degree burglary in connection with his armed robbery of a jewelry store in Beverly Hills, California. The California Supreme

Court, which had previously affirmed his convictions and sentence, denied his habeas petition. The federal district court likewise denied his federal petition under 28 U.S.C. § 2254. On appeal from that denial, Livaditis argues that the district court erred in denying two of his ineffective assistance of counsel claims. In particular, he argues that his trial counsel was ineffective for failing to investigate and present two types of mitigation evidence: 1) evidence that Livaditis's mother was mentally ill and abusive during Livaditis's youth, and 2) evidence that Livaditis suffered from mental impairments prior to and through the time of his crimes. Under the deferential standard of review that applies, we hold that the California Supreme Court could have reasonably concluded that both claims lacked merit. We therefore affirm.

## I.  Background

On June 23, 1986, twenty-two-year-old Steven Livaditis robbed the Van Cleef & Arpels jewelry store in Beverly Hills. Shortly after the store opened, Livaditis entered carrying a briefcase. A security guard (William Smith) and three sales clerks (Ann Heilperin, Hugh Skinner, and Carol Lambert) were in the main sales area at the time. Livaditis and Heilperin entered the adjoining boutique after Livaditis asked to look at some watches. A few minutes later, Heilperin screamed. Livaditis, displaying a revolver, forced Heilperin back into the main sales area. Although Smith attempted to draw his weapon, Livaditis disarmed him. A shipping clerk (Robert Taylor) ran into the sales room and was also taken hostage. Everyone else in the building escaped.

The police quickly surrounded the store. Livaditis forced the five hostages into the watch boutique and ordered Taylor

and Lambert to bind the other hostages' ankles and hands. He also ordered them to fill the briefcase with watches.

Livaditis then attempted to leave the store but returned when he saw the police. He ordered Lambert to bind Taylor in a sitting position and then dial 911. On the phone, Livaditis demanded that he be put on the news and provided with a television set and that the police leave. He threatened to "execute these people one at a time."

Smith was the first hostage to be killed. Livaditis stabbed Smith in the back with a hunting knife after Smith said that Livaditis thought he was a "big man with that gun." Smith bled to death in front of the other hostages. Livaditis then covered Smith's body, which was still bound and face down on the ground, with a coat. He left the knife in Smith's back. Livaditis subsequently told a reporter that he stabbed Smith because Smith did not follow orders and "kept talking." Livaditis said that he felt no remorse for the stabbing.

Heilperin was next. Livaditis appeared angry at Heilperin because she screamed at the beginning of the robbery. He then ordered her to lie down next to Smith's body. While on the phone with a local media outlet, Livaditis told the reporter to wait and then walked over to Heilperin and shot her. She died instantly. Livaditis told the reporter that his gun had misfired.

Livaditis held the remaining hostages in the store for approximately thirteen hours. Skinner eventually proposed an escape plan. Skinner suggested that the three hostages and Livaditis exit the store under a blanket so that the police would not be able to tell which person was the gunman. They would be tied together at the waist, with Livaditis in the middle. They would then walk to a nearby car and escape. After Livaditis agreed to this plan, Lambert spent a few

hours sewing a blanket from cloth used for jewelry displays. While she was sewing, Livaditis put more jewelry into his briefcase. Once Lambert finished, Livaditis and the hostages practiced walking under the blanket for a couple of hours.

At approximately 11:30 pm, Livaditis and the hostages exited the store under the blanket. As they walked, Skinner and Taylor yelled that they were hostages. Livaditis threatened to kill the hostages if the police intervened. When the police threw "flash-bangs" (explosive diversion devices) as the group reached the car, the blast separated Skinner from Livaditis and the other hostages. Skinner pointed to Livaditis and yelled, "Here he is." Unfortunately, a police sharpshooter stationed on a nearby parking structure mistakenly believed that both male hostages were black and that only Livaditis was white. In fact, Skinner was also white. When the sharpshooter saw Skinner, a white man who resembled the general description the police had received of the gunman, he believed that Skinner was the perpetrator. The sharpshooter heard his spotter say "shiny object" and heard someone else say "gun." He then shot and killed Skinner, believing that Skinner was the gunman and was about to start killing one or more of the remaining hostages.

At that point, the officers arrested Livaditis. Livaditis told the police that he killed Smith because Smith had been "uncooperative and antagonistic" and "to keep control of the situation." He said that he killed Heilperin because "he felt that he had to kill another hostage in order to prove that his demands should be taken seriously." He said that he was sorry and that his plan had only been to rob the store.

Livaditis pled guilty to the first degree murders of Smith, Heilperin, and Skinner; five counts of robbery; three counts of kidnapping; and one count of second degree burglary. He admitted several special circumstance allegations, including

murder during the commission of robbery and burglary, multiple murder, and weapons enhancements. After jury selection, the case proceeded to the penalty phase.

## A. *The Penalty Phase*

During the penalty phase, in addition to evidence about the circumstances of the Van Cleef & Arpels robbery and murders, the state presented evidence of prior crimes and bad acts by Livaditis. That included evidence that he robbed a jewelry store in Las Vegas at gunpoint in February 1986, four months before the Beverly Hills crimes. During the Las Vegas robbery, Livaditis forced two store employees to lie bound on the floor, threatened to kill them, and kicked one of them repeatedly. He escaped with jewelry worth over $400,000 retail, or $177,555 wholesale. Livaditis also had one prior felony conviction for burglary and one for possession of stolen property. In addition, the state's evidence described three prior instances in which Livaditis forcibly resisted arrest.

In arguing for a sentence less than death, the defense focused on several mitigation themes, including family sympathy, pleas for mercy, and Livaditis's acceptance of responsibility for his crimes. Seven witnesses testified on Livaditis's behalf.

Sophie Livaditis, Livaditis's mother, explained the circumstances of her arrival to the United States and described her tumultuous marriage to Louis Livaditis, Livaditis's father. She testified that Louis abused her in front of their children and abused their children as well. She explained that due to her recurring illnesses, she had to send Livaditis to St. Basil's Academy, a Greek Orthodox orphanage in upstate New York, for two years during his childhood. According to Sophie, Livaditis was "never happy

there" because he was homesick. She also described the severe appendicitis Livaditis suffered as a child and a head injury that he received at St. Basil's. She said that she "had no problems" with her children and was "very close" with Livaditis.

Sophie believed that Livaditis's problems began during his time in the U.S. Army and became worse after he left the service and moved to Las Vegas. She said that the move was "his disaster" because "he enrolled himself with the bad people." She said that she was shocked when she found out about his crimes because the family "never had problems" and Livaditis had "good plans for the future." She said that her son "knows that he did a very bad thing" and that she "was hurt, very ashamed" and was "grieving with the victims' family."

On cross-examination, Sophie testified that her ex-husband hit and spanked each of her children and repeatedly stated that all of her children had the same upbringing and the same advantages and disadvantages. She reaffirmed that she never had trouble with her children.

Two of Livaditis's aunts and one of his uncles also testified on his behalf. Their statements were generally similar to Sophie's testimony. One aunt, Pauline Poulakos, testified that Louis Livaditis was "like a monster in the house" and that the children were afraid of him. She said that Louis hit Sophie, including while she was pregnant. She described Livaditis's unhappiness at St. Basil's and his desire to return home. She said that Livaditis was a "normal boy" who tried to help his mother and that he was "very, very sorry" for what he did. She also rooted his problems in his move to Las Vegas.

Voula Boulari, the other aunt, testified about Livaditis's "delicate character" as a child. She said that she would not imagine that he would commit such a crime and that she was "ashamed of what he did." She said that he "has completely regretted what he did" and that he told her that he "went there just to steal and not cause any other trouble and then he was afraid."

Theofanis Thantzalos, Livaditis's uncle, testified about Livaditis's time at St. Basil's. He also said that Livaditis "acted natural" when he lived with them in Greece as a teenager. Like Sophie, Theofanis indicated that Livaditis's problems dated back to his time in the army. He recalled that when Livaditis visited Greece on a leave of absence from the army, "he acted kind of wild."

Father Angelo Gavalas, the family's Greek Orthodox priest, testified about Sophie's challenges as a severely ill single parent. He said that Livaditis had an excellent relationship with Sophie. He also discussed Livaditis's time at St. Basil's and said that Livaditis "managed to stay two years under great duress" because he was very unhappy there. Father Gavalas testified that the Livaditis family was "close knit," so that "if something happens to one of them, it really happens to all of them."

Livaditis's brother, George, testified next. He said that he had "sort of blacked out" his younger years but that he remembered that his parents' relationship "wasn't too nice." He said that life after his parents divorced was "kind of tough" because his mother had to take care of four children alone and struggled to make ends meet, to the point that she was forced to sort through garbage cans to find food and clothes. George said that Livaditis "was always the first to try and do something" to help their mother. He also indicated that Livaditis's problems originated in Las Vegas. He

believed that when Livaditis moved to Las Vegas, he was "more confused than ever before" and "really didn't know why he was born, basically, his purpose in life." On cross-examination, George testified that Livaditis was Sophie's favorite but said that Livaditis was not treated differently than the other children, with the exception of traveling to Greece with Sophie.

Finally, Livaditis's sister Fanny testified. She said that Livaditis was very close to Sophie and spent more time with her than the other children. Fanny testified that Livaditis "wasn't very talkative" and "looked very preoccupied and sort of moody and depressed" after he left the military. Livaditis told her that he felt confused and couldn't find any meaning in his life. Fanny said that she forgave Livaditis for what he did and wanted him to live. Livaditis's other sister did not testify.

In closing arguments, the state argued that Livaditis's prior crimes were the beginning of a pattern of criminality that his family either did not see or did not want to see. The state argued that all of the Livaditis children "basically had the same background," but "if anyone had more of an advantage growing up than anyone else, it would be the defendant" because he was "obviously the favorite of the mother." The state emphasized that Livaditis "had good family" and "a good support network" but engaged in a pattern of refusing to take responsibility for his bad choices. The state then detailed the circumstances of the Van Cleef & Arpels robbery and the murders of the three hostages and placed particular emphasis on the fact that Livaditis made the choice to commit these crimes and bore full responsibility for the consequences.

During the defense's closing argument, Livaditis's attorney, Michael Demby, noted that Livaditis had accepted

responsibility for his crimes and admitted his guilt, even though he knew that he would either get life in prison without parole or the death penalty. He urged the jury to be cautious in deciding on the death penalty and asked them to look at Livaditis's background. He said that Livaditis did not have a lifetime record of criminality, unlike many other defendants, and had not been planning to kill the hostages. Demby repeatedly emphasized the effect of Livaditis's crimes and sentence on his family members, who knew a "good" and "kind" side of Livaditis.

The jury began its deliberations on June 16 and returned a verdict of death on June 19, 1987. Livaditis was sentenced to death on July 8, 1987.

## B. Procedural History

The California Supreme Court affirmed Livaditis's death sentence, without dissent, in a published opinion filed on June 18, 1992. *People v. Livaditis*, 831 P.2d 297 (Cal. 1992). The United States Supreme Court denied his petition for a writ of certiorari on March 8, 1993. *Livaditis v. California*, 507 U.S. 975 (1993) (mem.).

Livaditis successfully applied for a stay of execution and appointment of counsel from the federal district court on April 22, 1996. He filed his first federal habeas petition on April 23, 1997. On August 20, 1997, he simultaneously filed a habeas petition in the California Supreme Court and an amended federal habeas petition in the district court. The California Supreme Court summarily denied his state petition for a writ of habeas corpus on the merits on November 24, 1998.

The district court granted Livaditis leave to file a second amended habeas petition on August 12, 1999. After

substantial briefing and other litigation activity, the district court, considering only the record before the California Supreme Court, denied Livaditis's habeas petition in a lengthy written order filed on July 8, 2014.[1]

Livaditis appealed. He requested a certificate of appealability on three claims. A motions panel of our court granted a certificate of appealability on part of his claim that he received ineffective assistance of counsel ("Claim 11"), namely, whether "trial counsel was effective at the penalty phase in failing to present any mitigating evidence concerning: (i) Petitioner's alleged mental health problems; and (ii) Petitioner's allegedly abusive and mentally unstable mother." Livaditis does not present any uncertified claims on appeal.

## II. Discussion

We review the district court's denial of habeas relief de novo. *Hurles v. Ryan*, 752 F.3d 768, 777 (9th Cir. 2014). Because Livaditis filed his petition after April 24, 1996, the Antiterrorism and Effective Death Penalty Act (AEDPA) governs our review of his habeas claims. Under AEDPA, we may grant a writ of habeas corpus only if the state court's

---

[1] The district court had earlier issued an order granting an evidentiary hearing on various claims in the petition, including the claims that Livaditis raises on appeal. The evidentiary hearing took place over four days in 2010. After the evidentiary hearing, the Supreme Court issued its decision in *Cullen v. Pinholster*, 563 U.S. 170 (2011). In *Pinholster*, the Court held that a federal habeas court conducting review under AEDPA "is limited to the record that was before the state court that adjudicated the claim on the merits." *Id*. at 181. The parties filed briefs with the district court addressing the impact of the decision on Livaditis's petition. The district court ultimately considered only the record before the California Supreme Court in denying Livaditis's habeas petition.

adjudication of the merits of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

This is a high bar, as "it was meant to be." *Harrington v. Richter*, 562 U.S. 86, 102 (2011). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." *Id.* at 101 (quotation marks omitted).

Where, as here, a state court summarily denies a claim, a petitioner "can satisfy the 'unreasonable application' prong of § 2254(d)(1) only by showing that 'there was no reasonable basis' for the [state court's] decision." *Cullen v. Pinholster*, 563 U.S. 170, 188 (2011) (quoting *Richter*, 562 U.S. at 98). We "must determine what arguments or theories . . . could have supporte[d] the state court's decision; and then [we] must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme Court]." *Id.* at 188 (some alterations in original) (quoting *Richter*, 562 U.S. at 102). Our review is "limited to the record that was before the state court that adjudicated the claim on the merits." *Id.* at 181.

We evaluate a habeas claim de novo and consider evidence presented for the first time in federal court only if we find, "considering only the evidence before the state court, that the adjudication of a claim on the merits resulted in a decision contrary to or involving an unreasonable application of clearly established federal law, or that the state

court's decision was based on an unreasonable determination of the facts." *Hurles*, 752 F.3d at 778.

## A. *The Record on Appeal*

In *Pinholster*, a habeas case involving another California murder conviction and capital sentence, the Supreme Court held that a federal habeas court conducting review under AEDPA "is limited to the record that was before the state court that adjudicated the claim on the merits." 563 U.S. at 181. This rule applies even when the state court has summarily denied the habeas claims. *See id.* at 181, 188.

The district court correctly applied *Pinholster*. It based its decision only on the record before the California Supreme Court (including the trial court record[2]) and did not consider the evidence presented in the federal court evidentiary hearing. We take the same approach.

## B. *Ineffective Assistance of Counsel Claims*

Livaditis raises two ineffective assistance of counsel claims on appeal. He argues that his trial counsel was deficient for failing to present two categories of mitigating

---

[2] In *Pinholster*, the Supreme Court also explained that when the California Supreme Court issues a summary denial of a habeas claim, it "generally assumes the allegations in the petition to be true, but does not accept wholly conclusory allegations, and will also 'review the record of the trial to assess the merits of the petitioner's claims.'" 563 U.S. at 188 n.12 (alterations and citation omitted) (quoting *In re Clark*, 855 P.2d 729, 742 (Cal. 1993)).

The record before the California Supreme Court in this case included both the allegations in Livaditis's habeas petition and the record of the trial. *See id.* The California Supreme Court had previously reviewed the trial record in connection with Livaditis's direct appeal.

evidence: 1) additional information about Sophie Livaditis's abuse and mental illness; and 2) information about Livaditis's mental illness and brain damage.

For our review under AEDPA of claims of ineffective assistance of counsel, the law clearly established by decisions of the U.S. Supreme Court is *Strickland v. Washington*, 466 U.S. 668 (1984). *See Ayala v. Chappell*, 829 F.3d 1081, 1096 (9th Cir. 2016). Under *Strickland*, the petitioner must satisfy a two-part test:

> First, the [petitioner] must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable.

466 U.S. at 687.

Our review "of counsel's performance must be highly deferential." *Id.* at 689. We must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* When reviewing a state court's decision on a *Strickland* claim under AEDPA, the federal court's review must be "doubly" deferential, *Richter*, 562 U.S. at 105, because *Strickland* provides courts with a general standard:

> Because judicial application of a general standard "can demand a substantial element

of judgment," the more general the rule provided by the Supreme Court, the more latitude the state courts have in reaching reasonable outcomes in case-by-case determinations. *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004). In turn, the state courts' greater leeway in reasonably applying a general rule translates to a narrower range of decisions that are objectively unreasonable under AEDPA. Accordingly, we review a state court's decision applying *Strickland*'s general principles with increased, or double, deference.

*Cheney v. Washington*, 614 F.3d 987, 995 (9th Cir. 2010).

The California Supreme Court denied Livaditis's petition summarily. Because it did not discuss its reasons for denying the claims of ineffective assistance of counsel, the question before us becomes "whether there is any reasonable argument" that could have supported that decision under the deferential standard that applies in this context. *Richter*, 562 U.S. at 105.

After considering the record, we conclude that there were reasonable grounds to support the denial of relief by the California Supreme Court on Livaditis's claims of ineffective assistance of counsel. Put in terms of the relevant standard under AEDPA, the decision by the California Supreme Court was not based on an unreasonable application of the law or determination of facts.

1.  The Defense Strategy

Michael Demby, a deputy public defender, was appointed to represent Livaditis shortly after his arrest. At

that point, Demby had more than seventeen years of experience as a public defender. An investigator assisted Demby on the case.

Demby provided a declaration in Livaditis's state habeas proceedings explaining his strategy for the penalty phase. In this declaration, Demby stated that he "knew early on that a penalty phase investigation was of primary importance in preparing for trial." Demby stated that Livaditis cooperated with preparations for trial and that he interviewed Livaditis about his background multiple times. Demby also interviewed several of Livaditis's family members. According to Demby, these interviews made it "obvious that Mr. Livaditis came from a very dysfunctional family." In particular, he "knew from other members of the family that [Livaditis's mother] suffered from mental and physical illnesses throughout Mr. Livaditis's childhood." According to Demby, Livaditis's mother initially refused to cooperate meaningfully in Livaditis's defense. Demby also knew that Livaditis's sister, Pauline, was mentally ill.

Demby learned that Livaditis "had serious abandonment issues" and that his father had been abusive. Livaditis was placed at St. Basil's when he was eight and stayed there for almost two years, even though he was extremely unhappy. The family only removed him when he began to starve himself and became very ill. Demby learned that Livaditis was then "shuffled to different family members, including an aunt and uncle in Greece who physically and psychologically abused him." He also discovered that Livaditis had other physical problems in his youth, including at least two head injuries, nearly fatal appendicitis, and a serious fall.

Demby stated that did not obtain or review additional records in preparing Livaditis's defense because the trial commenced before he was fully prepared:

> The trial prematurely ended my efforts to obtain medical records and other social history documents, and it prevented any attempts to obtain more information about the orphanage where Mr. Livaditis was so unhappy as a child as well as information regarding Mr. Livaditis's training and service in the Army Reserves. Had I been given additional time, I would have done everything I could to obtain additional medical records and related social history documents.[3]

Demby stated that his initial strategy was to focus on the physical abuse that Livaditis's father and uncle inflicted on him, as well as the detrimental effect of his family's abandonment. Ultimately, however, Demby decided to present testimony from Livaditis's family members instead. He hoped that "the jury would like these family members and would want to do something for them, even if they did not want to do something for Mr. Livaditis." He based this decision on interviews that he conducted with various members of the family in Greece, including Sophie Livaditis.

To that end, Demby's mitigation strategy focused on the closeness of the family and the fact that Livaditis only began

---

[3] There is no claim before us that Livaditis's trial counsel did not have adequate time to prepare for the penalty phase of trial, or that the trial court wrongly denied a motion to continue the trial.

to have problems as a young adult after leaving the army. Demby also elicited testimony that Livaditis's father was abusive, but he did not probe into the abuse in depth.

### 2.   Mental Illness of and Abuse by Livaditis's Mother

Livaditis argues that Demby's assistance was constitutionally deficient because Demby was aware that Livaditis's mother, Sophie, suffered from severe mental illness and had abused her children but failed to investigate further or present any of this evidence in mitigation. The information that Demby was aware of included statements of family members and the family priest describing Sophie as depressed, ill, emotionally and mentally unstable, and in need of special therapy; a statement from a family member that Sophie abused Livaditis; and statements from family members and Livaditis describing his misery at St. Basil's and the rarity of Sophie's visits.

Based on this information, Livaditis now contends that Demby should have pursued further investigation into Sophie's background and abuse. He argues that, had Demby and his investigator performed proper interviews with family members, they would have learned that Sophie and her family experienced hardship in Greece; mental illness was common in Sophie's family; Sophie's parents were mentally ill; Sophie was "essentially sold" to relatives in the United States who did not treat her well; Sophie's marriage to Louis Livaditis was difficult from the beginning; Sophie attempted to self-induce abortions, including while pregnant with Livaditis, because she did not want children; Sophie beat all of her children; relatives described her as suffering from a nervous breakdown and odd behavior after she and Louis were divorced; Sophie prohibited her children from contacting any member of the Livaditis family, including Louis; she was referred for a psychiatric consultation

because of "bizarre behavior" during a hospital stay, resulting in a diagnosis of a "hysterical personality with the possibility of underlying ego pathology," with a possible dissociative disorder; and Sophie enlisted other relatives to discipline and beat her children. Livaditis argues that Demby's performance as his attorney was constitutionally deficient for failing to discover and present any of this evidence in mitigation.

We disagree. Under *Strickland*, "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgment supports the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." 466 U.S. at 690–91. Reviewing courts must "apply[] a heavy measure of deference to counsel's judgments" about the decision not to investigate. *Id.* at 691.

The record reflects that Demby did perform an initial investigation of Livaditis's social background, including his mother's abuse and mental illness. Although Demby apparently did not have all of the information that Livaditis describes, he was aware that a focus on Sophie's abuse and mental illness was a possible mitigation strategy. Once he became aware of an alternative strategy, namely, mercy based on pleas from Sophie and other sympathetic family members, he was in a position to make a reasonable decision about how to proceed, and whether to continue to investigate Sophie's background.

The additional evidence of Sophie's mental illness and abuse that Demby failed to discover did not differ meaningfully from the evidence that Demby already had. Rather, it primarily added details about issues of which

Demby was already aware. The California Supreme Court could have reasonably concluded that this additional evidence would not have altered Demby's strategy. *See Bobby v. Van Hook*, 558 U.S. 4, 11–12 (2009) ("[This] is . . . a case, like *Strickland* itself, in which defense counsel's 'decision not to seek more' mitigating evidence from the defendant's background 'than was already in hand' fell 'well within the range of professionally reasonable judgments.'" (quoting *Strickland*, 466 U.S. at 699)).

Likewise, the California Supreme Court could reasonably have concluded that Demby did not select a constitutionally deficient mitigation strategy. The U.S. Supreme Court has recognized that a "mercy" or "family sympathy" theme is a valid approach to mitigation. *See Pinholster*, 563 U.S. at 191 (denying petitioner's ineffective assistance of counsel claim, in part because the "family sympathy" mitigation strategy "was known to the defense bar in California [in 1984] and had been used by other attorneys"). And here, pleading for mercy on behalf of Livaditis's family was a legitimate strategy given its closeness, which Demby understood after extensive interviews with the family.

Furthermore, as the district court correctly noted, emphasizing Sophie's abuse of Livaditis would have been inconsistent with portraying her as a sympathetic witness and would therefore have limited the efficacy of a family sympathy approach. Indeed, in light of the challenges that Demby had in convincing Sophie to cooperate with his investigation and testify during the sentencing, portraying Sophie as severely mentally ill could have had a detrimental impact on her participation in the trial. In addition, this evidence could have undercut the jury's view of her testimony.

As for the second prong under *Strickland*, the state court could also reasonably have concluded that Livaditis was not prejudiced by Demby's failure to present evidence of Sophie's mental illness and abuse. Demby did elicit some testimony about Livaditis's difficult upbringing during the penalty phase. Although evidence of Sophie's abuse would have added to this testimony, much of the new evidence that Livaditis cites was cumulative. The California Supreme Court could reasonably have concluded that this evidence would not have changed the outcome of Livaditis's sentencing. *See Wong v. Belmontes*, 558 U.S. 15, 22–23 (2009) (holding that the state court could reasonably have concluded that the petitioner was not prejudiced when the evidence that counsel failed to present was cumulative of the "humanizing" evidence counsel used because the jury was already "'well acquainted' with [the petitioner's] background and potential humanizing features" (quoting *Schriro v. Landrigan*, 550 U.S. 465, 481 (2007))).

We conclude that the California Supreme Court did not unreasonably apply federal law or unreasonably determine facts in denying the ineffective assistance of counsel claim based on the mental impairments and abusive conduct of Livaditis's mother.

### 3.   Livaditis's Mental Impairments

Livaditis also argues that Demby was constitutionally deficient because he was aware that Livaditis had signs of possible mental illness but failed to investigate further or present any of this evidence in mitigation.

Livaditis correctly asserts Demby had information suggesting that Livaditis may have been mentally ill. That information included Livaditis's own statements to Demby that he was a little "unstable," had not been "thinking like a

normal person," and was "screwed up in the head"; Livaditis's statements to Demby that at the beginning of the robbery, he was "high" and "excited" and felt "like he was President of the United States," but later he felt angry and likened his feelings to a person who was at "a party having a good time and somebody does something to ruin it"; a co-worker's statement that Livaditis was "a hyper person who was given to abrupt mood swings"; a statement from Livaditis to his cousin that he experienced "an inner rage that left him confused"; a copy of the police hostage negotiator's notes that described Livaditis's false assertions that he was a Vietnam veteran, a college graduate with several degrees, was fluent in four languages, was capable of "maxing" aptitude tests, and was able to move water with telekinesis; a transcript of Livaditis's post-arrest interview indicating that he was chuckling to himself and said that he killed one of the hostages because something "kicked inside" and he heard a voice telling him to kill the hostage; and an interview with the media in which Livaditis described himself as a Robin Hood figure. Demby also received Livaditis's school records, which indicated that Livaditis was a "below average student" who had an "inability to read with comprehension" and was recommended to repeat third grade; and the transcript of a police interview in which Livaditis said that he may not be able to keep up with their interview questions because he did not have a lot of "understanding."

Demby's trial notes indicate that he discussed the issue of mental illness with Livaditis. Those notes reflect that Livaditis told Demby that he was "not crazy," although it had "crossed his mind to act crazy" and he could "do a good job" acting the part. The notes indicate that Livaditis considered feigning mental illness because he had "heard they could not execute an insane person." Demby also

consulted a "mental health expert," although the record is silent regarding the results of that consultation.

Livaditis argues that Demby should have investigated Livaditis's mental impairments further. Had he done so, Livaditis contends that he could have discovered jail medical records requesting toxicology testing, which a doctor ordered after he observed "Abnormal Behavior," with a handwritten notation of "Drugs/vs/Psychosis"; the results of that toxicology testing that showed no presence of drugs or alcohol; jail records from a few days after Livaditis's arrest indicating that he told staff that he was "hearing voices" and was "willing to see psych"; and a psychiatrist's tentative assessment that he had an "adjustment disorder" with "mixed emotional features" and an antisocial personality disorder.

In the state post-conviction proceedings, Livaditis's new counsel retained three mental health experts to perform an analysis of Livaditis's mental health. Dr. Rosenberg, a psychologist, prepared a report after interviewing Livaditis for 18 ½ hours, Fanny Livaditis for 5 hours, and George Livaditis for 5 hours. She also used a detailed social history of Livaditis and related exhibits to prepare her evaluation. She concluded that Livaditis's childhood trauma "adversely affected his subsequent psychological development, including his behavioral, social, emotional, and cognitive functioning."

Dr. Watson, a neuropsychologist, performed an evaluation based on 17 hours of interviews and tests. Dr. Watson also reviewed family declarations, Livaditis's hospital records from 1985 and 1986, his educational and army records, other family medical records, his jail medical records, and Dr. Rosenberg's declaration. Dr. Watson concluded that Livaditis had a "mild degree of

neuropsychological impairment" and intellectual functioning "below that expected based upon both demographic and performance characteristics."

Dr. Foster, a neuropsychiatrist, provided an expert declaration on the basis of four sets of examinations, interviews, and tests that he conducted over 16 hours. He also reviewed Dr. Rosenberg's social history, the declarations of family members and acquaintances, and Dr. Watson's report. Dr. Foster found that Livaditis suffered from "severe psychiatric disorders, neuropsychological and medical deficits which significantly compromised his ability accurately to perceive and understand the world around him, his ability to respond adequately to complex situations, and his ability to function normally." According to Dr. Foster, Livaditis's disorders included both post-traumatic stress disorder and a "severe mood disorder with intermittent psychotic features," most likely bipolar disorder, but possibly schizoaffective disorder. Dr. Foster also concluded that Livaditis's symptoms were "consistent with acquired and, perhaps, congenital brain injury."

After reviewing that record, the district court held that the California Supreme Court could have reasonably denied Livaditis's habeas petition under both prongs of *Strickland*. With respect to prejudice, we agree. We conclude that the California Supreme Court could have reasonably determined that Livaditis was not prejudiced at the penalty phase.[4]

"Establishing prejudice in the death sentence context requires a showing that there is a reasonable probability that, absent the errors, the sentencer would have concluded that

---

[4] As it is unnecessary, we do not address Demby's performance. *See Pinholster*, 563 U.S. at 202.

the balance of aggravating and mitigating circumstances did not warrant death. The defendant bears the highly demanding and heavy burden of establishing actual prejudice." *Bible v. Ryan*, 571 F.3d 860, 870 (9th Cir. 2009) (quotations and punctuation omitted). For three reasons, we conclude that the California Supreme Court could have reasonably determined that Livaditis did not meet that burden.

First, several aggravating circumstances supported the jury's verdict. This was not the first time that Livaditis had demonstrated ruthlessness during the commission of a violent crime. As noted above, the state presented evidence of Livaditis's record of crimes and bad acts. In particular, four months before the Beverly Hills robbery and murders, Livaditis robbed a jewelry store in Las Vegas at gunpoint. During that robbery, he tied up two of the store's employees, verbally abused them, threatened to kill them, and kicked one of the bound employees repeatedly.

Livaditis exhibited similar callousness during the Beverly Hills robbery and murders when he killed Smith and Heilperin.  He stabbed Smith because Smith verbally defied him and let him bleed to death in front of the other hostages. He then killed Heilperin because he wanted to prove that his demands were serious. He chose Heilperin because she had screamed at the start of the robbery. As in the Las Vegas robbery, both victims were helpless. Moreover, during press interviews Livaditis indicated that he believed Smith's stabbing was "appropriate." The cruelty Livaditis displayed over the course of multiple crimes constituted a substantial aggravating factor. *See, e.g.*, *Sully v. Ayers*, 725 F.3d 1057, 1069 (9th Cir. 2013) ("staggering" aggravating evidence weighed against a conclusion that defendant was prejudiced); *Bible*, 571 F.3d at 870 (the "powerful

aggravating circumstances surrounding [the] murder" weighed against a conclusion that defendant was prejudiced).

Second, the California Supreme Court could have reasonably decided to accord the declarations submitted by Livaditis's mental health experts little weight. Dr. Rosenberg focused on describing the psychological effects of Livaditis's abusive childhood. Because Demby elicited testimony that demonstrated that Livaditis had been abused as a child and the jury could have inferred negative effects from that treatment, the California Supreme Court could have considered Dr. Rosenberg's testimony cumulative. *See Wong*, 558 U.S. at 22–23. Moreover, Dr. Rosenberg did not propose a clinical diagnosis. *See Runningeagle v. Ryan*, 825 F.3d 970, 987 (9th Cir. 2016) (discounting mental health declaration that "gave no affirmative diagnosis").

Dr. Watson indicated only that Livaditis suffered from a "mild degree of neuropsychological impairment." The California Supreme Court could have concluded that mitigating effect of that statement was limited. *See id.* at 987–88 (giving limited weight to mental health diagnosis that "used qualifying language").

Dr. Foster discussed Livaditis's history of trauma, child abuse, and neglect. Although Dr. Foster proposed several clinical diagnoses, those diagnoses were based on interviews conducted nearly ten years after the murders. *See id.* at 988 (discounting diagnosis produced more than 20 years after the crimes were committed). Moreover, on the crucial issue of brain damage, Dr. Foster simply opined that Livaditis's symptoms were "consistent with" brain damage. *See Leavitt v. Arave*, 646 F.3d 605, 614 (9th Cir. 2011) (holding, in pre-AEDPA case, that mental health opinions that "couch results

in tentative language" are "simply not enough to show prejudice").

The record also reflected that Livaditis had told Demby that he was "not crazy" but that he had considered acting crazy and could "do a good job" at that. The California court may have decided as a result to treat with skepticism expert statements based on interviews of Livaditis conducted years after he had already been sentenced to death. That skepticism could have been fueled by Demby's own declaration, which indicated that he had consulted his own mental health expert at trial. It would not have been unreasonable for the California Supreme Court to discount the testimony of these mental health experts.

Third, as discussed above, Demby put on extensive mitigation evidence, including testimony from Livaditis's family. One of the key themes of Demby's mitigation strategy was the closeness of the family and the jurors' potential sympathy for Livaditis's mother, Sophie. The mental health experts' declarations discussed the abuse Livaditis suffered at Sophie's hands at length. All three experts relied on that abuse in reaching their conclusions. Any testimony along the lines suggested by the later testimony from those experts would almost certainly have touched on Sophie's abuse. That testimony could have rendered Sophie far less sympathetic in the jurors' eyes. Thus, if Demby had called on mental health experts during mitigation, those experts may have undercut the mitigation case that Demby did put on. *Cf. Pinholster*, 563 U.S. at 202 (no prejudice where, *inter alia*, "some of the new testimony would likely have undercut the mitigating value of the testimony by Pinholster's mother").

After considering the aggravating evidence adduced, the substantial mitigating evidence that Demby did present, and

the mitigation evidence he could have presented, the California Supreme Court could have reasonably concluded that further evidence concerning Livaditis's mental health would not have made a difference. More precisely, in the terms used in *Strickland*, the California Supreme Court could have reasonably concluded that there was not a "reasonable probability that . . . the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

## III.    Conclusion

We affirm the district court's denial of Livaditis's petition for a writ of habeas corpus. Under *de novo* review, we might reach a different conclusion. Especially under the double deference that applies to our review, however, we cannot say that the inferred conclusions by the California Supreme Court constituted unreasonable applications of federal law or unreasonable determinations of the facts. *See Richter*, 562 U.S. at 105.

**AFFIRMED.**